The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Good morning. We've had a, we're going to have a busy day today. We have two cases that are scheduled for oral argument. We have three cases that have been submitted on the briefs. So let's move to the first case for argument of this morning. And that, let's see, that case is Trans Ova Genetics, L.C. v. XY, LLC, case number 19-2312. Mr. Kelly, I understand that you have reserved five minutes for rebuttal. Is that correct? That is correct, Your Honor. Okay. So you may, you may begin. Thank you and good morning, Your Honors. May it please the court. Section 6-9 patent claims a method of fertilizing an egg with frozen thawed sorted semen at success levels at least 70% of that with non-frozen unsorted semen. The central issue in this IPR is whether Table 3 of the Lew Reference, which the parties agree teaches the claim 70% success level, whether that reference is proper prior art. That issue in turn centers on whether non-inventor David Green made an inventive contribution to Lew Table 3. Now in meeting its burden of production, Trans Ova showed that the Lew Reference, which is authored by three of the four patent inventors, including David Cran, expressly attributes the Table 3 data to unpublished results provided by Green. The three inventors, including David Cran, thanked Green for his permission to cite his unpublished data. That indicates that it was, in fact, Green's data. After all, you don't need permission to publish your own data. Now, Trans Ova also showed that before this IPR, XY never contested the fact that Lew Table 3 was prior art. Instead, it repeatedly distinguished the reference during prosecution, falsely claiming that it failed to teach the patent office to allow the claims. In this IPR, however, XY switched position. It wants the PTO and this court to forget all that happened during prosecution. And now for the first time, XY embraces the fact that Lew Table 3 does teach the 70% success level. Because now, for the first time, XY has produced a declaration from its longtime patent attorney, Mr. Craig Miles, the man who drafted the priority application, who copied the Lew Table 3 data into that application without attribution, who erased Green's name from the Table 3 data, and who deliberately omitted Green as an inventor. Counselor, this is Judge Reina. Explain to the court real quickly why Craig Miles' testimony is hearsay, and we certainly moved to exclude it as hearsay. One of the errors that we're pointing out in the appeal is the board's unreasonable refusal to exclude certainly all the portions of Miles' testimony that related to what Cran allegedly told him. Our position is certainly the board should have excluded that as hearsay. You know, Miles' testimony about what his position was, you know, and the fact that he drafted the application, we did not move to exclude that as hearsay. And I don't think that there's any dispute about his role in drafting the application or in copying the Lew Table 3 data into the application, or the fact that he deliberately deleted Green's name from that table, or the fact that he deliberately omitted both Green and Cran as inventors without having spoken to either of the gentlemen, and without having spoken to either of the other three inventors about Green or Cran's role in the invention. So the board determined that Miles' testimony was based on his own knowledge of the people at Cochin at the time, correct? Yes, well, the board claimed that it wasn't relying on anything that Cran had told Miles, but rather was relying on Miles' personal knowledge about Green. Everything hinges on Miles' knowledge about Green, Green's status as a, quote, bench technician, and his alleged role in the Table 3 experiments. The problem with that is that that is not what Miles testified to. Miles did not testify that he had any independent knowledge about Green's status or his role in the Table 3 experiments. He'd actually testified to the exact opposite. He repeatedly testified that all of his knowledge about Green, including who Green even was, he didn't even know who he was, Miles testified all that information came from Cran. So, you know, the first error that we point out in our brief is that the board erred in crediting Miles' testimony that Green was a bench technician at all, because it was not predicated on Miles' independent knowledge, but on Cran's say, description of Green. Now, you don't have to take my word for this, you know, again, Miles testified to this. At Appendix 898 to 899, Miles testified that it was Cran who told him who Green was. He was, quote, the David Green, an employee of Cogent. At Appendix 988 to 989, Miles testified that his lone phone conversation with Cran was, quote, the source of my information about Mr. Green's participation, end quote. Mr. Kelly, this is Judge Chun. I understand what you're talking about as to Mr. Green specifically. There was also a lot of testimony from Mr. Miles about his personal knowledge of the relationship between Cogent and XY through a lot of legal work that he had been doing between XY and Cogent, and also had personal knowledge about Dr. Cran's involvement with Cogent and serving as a liaison, XY's liaison at Cogent, and that Cogent was obviously running some of these tests using XY's technology, XY's know-how, XY's trade secret information. So, what Miles was testifying to was his knowledge of the overall structure of the relationship between XY and Cogent, and that Cogent and its employees just wouldn't have the information to run and produce results without having all the know-how from XY. So, I guess to the extent you are talking and focusing about what did Miles know about Green specifically, I understand your point, but I think what you have to also deal with is that there was some circumstantial evidence as to what XY possessed in terms of knowledge and information, and what XY's relationship was to Cogent, and why that could create an inference that really XY people were the architects behind any of the experiments being run at Cogent, rather than Cogent employees being architects of it, and really serving more as the chair of hands, quote-unquote. So, could you speak to that issue? I mean, as I understand it, the board was in a bind here, because it looked at the Liu reference on its face and could see that there was some ambiguity there as to just exactly what it is that Green did as it relates to that table. I mean, there's a lot of different ways to read it. One is, Green was the one who took the results from all the experiments, and created the table, and produced and organized the data in the format that is shown in the Liu reference. Another one is that he was the guy that actually ran the tests, but he didn't design any of the tests. He was basically just a pair of hands that ran the tests, that produced the results, and then he created the table. And the third was, he figured out how to run the tests, and what would be the most effective way to perform these experiments, and then did the tests themselves, and then collected the data and then presented in that table. But the reference doesn't tell us which way, one or the other, of those options we should really best think about, this reference to Green in the Liu reference. And so, the problem is, we don't have Green here. And so, how do we deal with this ambiguity? The board saw that there was this established relationship between XY and Cogent, which revealed that Cogent was really working more on behalf of XY. And that created an inference that the only way Cogent could do anything, and do anything correctly, was based on the insights and know-how that it got from XY. So, given that this is a very fact-specific, context-specific case, where we're dealing with this mystery behind what exactly it is that Green did, I mean, to this day, we still don't know. I didn't see anybody specifically tell us with any hard evidence, one way or another, what it is that Green did. How can we say with any confidence that the board got it wrong with its finding? Right, Your I would, I think, slightly disagree with the characterization that nobody told us what Green did. I would say that three patent inventors, including Dr. Cran, told us what Green did. That Green provided the data from Table 3, and more importantly, each of the inventors... This is Judge Clemmons. If you just might be very specific, we are now talking about what Cram said Green did. Green supplied the table, correct? I didn't catch that, Your Honor. Can you repeat it? Green supplied the table, correct? Yeah, I think I heard you say that Green supplied the data in the table. That much we know for sure, and we also know that the Cram authors, who are also the three of the four patent inventors, thanked him for his permission to publish that data, suggesting that he was the owner and custodian of that data. If Cram had conceived the subject matter and Green was just a bench technician, a pair of hands, then Cram would have... You have to come to grips, for my money, with the explication that Judge Chen gave you on the independent basis for the lawyers' knowledge about what was going on inside of UGENT and its relationship with XY. Right. Well, I would say that... I do believe what Judge Chen related is a record. You don't deny it, it's relevant evidence. Whether it's substantial evidence is another question, but it's relevant evidence. Well, what I don't deny is that Mr. Miles claims that he had a general familiarity with Cogent's operations and structure, and that he sent a few quotas. And that the invention couldn't have gone forward without trade secret information from XY, and that Green would not have had access to that information. Well, Mr. Miles did not testify that he had that knowledge at the time, so most of the knowledge that Mr. Miles testified he acquired about Cogent occurred years after this. He said that he would have been... This is a very interesting piece to me, because neither side really wanted to know what Green did. The briefs tell us Green won't have it. Cogent is very available. Cogent obviously knows what Green did or didn't do. And either one of you could have gone to Cogent and asked if you couldn't find Green, what did Green do? Well, we didn't think that was an... Can I tell you something? For my money, neither one of you wanted to know the answer to the question. It's one of those classic cases in litigation where there's a question you ask, and if you get the wrong answer, you lose. And so both sides decide not to ask the question, and instead to live with the consequences of circumstantial evidence that sort of grows around the subject. Your Honor, we didn't think that... Mr. Kelly, this is Judge Rayner. You're well into rebuttal time. If you could answer Judge Klinger's question, unless Judge Chen has another question, then we'll move on. No further questions for me. Thanks. All right. So we didn't initially think that we needed to contact Green. Recall that when we filed our petition, inventorship of Lew Table 3 was not an issue. XY had overcome Lew on the merits by falsely arguing that it failed to teach the 70% limitation. So we knew that was false, and our petition focused on proving that was false. The contribution of Green to Lew Table 3 was not an issue until XY put it at issue in his patent owner response. And that's when one party of mine called Cogent and found out what was going on. Well, I mean, at that point, both parties... I didn't really have a question. I was just saying, I see this case. This is a case where the parties chose not to find the truth, which was likely available about what Green did, because either side was afraid the answer would come up wrong. It happened to me in litigation all the time. And so instead, you rely on the circumstantial evidence. And as I understand the flow of the argument today, there's argument on both sides of the case. It's a close case. So the question is, under the standard of review, it's you lose. That's as simple as I can say. Do I have time to just respond? Yes, you do. Okay. I would say that the burden of production has shifted to XY. I don't think they met their burden of production. Certainly, they didn't file a disclaiming affidavit by Green. They didn't file an attribution declaration from any of the inventors. And I think the case law makes clear that the onus is on them. If they're trying to show that the reference is not by another, it's incumbent upon them to show that Green did not materially contribute to Loot Table 3. And they didn't submit any admissible evidence to that, other than Miles' general familiarity with Cogent, which he then testified he acquired in 2005 through an arbitration proceeding. Okay. I'm sorry, Judge Clearing, did you have a question? That's fine, sir. Yes, sir. Okay. All right. Well, let's move on. I think we understand that argument. And Mr. Kelly, I'm going to restore you to the five minutes of your rebuttal time, given our questioning. So let's hear now from Mr. Chen. Thank you, Your Honor. May it please the court, Julius Chen, on behalf of the Pelley XY LLC, as Transova recognizes, this appeal is about, quote, how the board balanced the evidence in finding that Green did not make an inventive contribution to Table 3 of the Loot reference. To see that substantial evidence supports that balancing, this court needs look no further than the evidence the board deemed particularly persuasive. Miles testified at Appendix 877, based on his familiarity with Cogent and due diligence, that he intentionally deleted the Green attribution when filing the provisional application, because he did not believe Green made an inventive contribution to Table 3. Mr. Chen, this is Judge Chen. I understand that Miles made that statement, that he did, quote, unquote, due diligence, and he concluded that Green's work did not merit being listed as a co-inventor. But could you get behind that statement a little bit more and explain to me what his thinking was? It wasn't clear to me how he arrived at that conclusion, other than the conclusory proclamation that he had investigated and concluded that he wasn't a co-inventor. Sure, sure, Your Honor. I'm happy to delve into that. I would point to two pieces of the record, which we think are substantial evidence for the board's finding here. And I think Your Honor actually referenced some of them before, but two pieces of evidence, the first being at Appendix 979 to 980, where Miles explains the basis for his knowledge and how he acquired it. He was XY's patent counsel, and specifically, he dealt with the licensing relationship. He says, quote, I handled the licensing agreement between XY and Cogent. I'm sorry, I'm asking for something a little more specific. I'm talking about when we go back in time, and Miles is writing up this patent application. And he's trying to figure out who are the co-inventors. And he decides that Seidel, Suh, and Liu are the co-inventors. He sees Green's name written on that table. What is it specifically that went through his mind so that he drew the conclusion that Green wasn't a co-inventor? What was it at that time that made him decide to go ahead, strip the Green name off the table, and go forward with a patent application that did not list Green as a co-inventor? Sure, Your Honor. I think the second piece of evidence will speak more directly to that. And that piece of evidence is at Appendix 985. And this is where Miles testifies that he understands the structure of Cogent at the time, and Dr. Cran's position as XY's liaison. Remember that Cran was an XY employee working with Cogent in a collaborative research endeavor. And what he says next, I think, gets to your point. He says, Mr. Green did not have any information that would have come from any other source than XY and through Dr. Cran to conduct the experiment that was in Table 3. And he says that he knows this specifically because of the general practice of XY to disseminate information in terms of protocols for that work and for Dr. Cran's participation in facilitating what would have otherwise been an unsupervised situation at Cogent. We think that that general knowledge of the way that the relationship worked, this particular licensing and relationship, I'm sorry, research relationship between XY and Cogent allowed the board to make a finding and draw the inference that when Miles went ahead and deleted the Green et al. attribution, which indisputably happened before Miles talked to Cran, that he did so because of his general knowledge of the way that the experiments would have been conducted and the inventive knowledge would have flowed from XY to Cran. And Tranzova has attacked Miles' credibility and the weight to be assigned to that testimony. But I think in the end, it's important to remember that this is a case about competing evidence. It was the board's role to weigh that evidence. I'm sorry, was there a question? Sorry. It was the board's role to weigh that evidence. And it's important to recognize, I think, what the board made explicit, both at the outset of its analysis at Appendix 15. And again, when it concludes its analysis at Appendix 19, it recognizes that Tranzova has some evidence that Green made a material contribution in some way. There is a possibility to read the record that way. But then it says we also have countervailing evidence and consistent with this court's case law. It says we need to weigh all the evidence together. And again, this is a question on which Tranzova bears the ultimate burden of proof. And critically here, the board finds Miles credible. There's an explicit finding because Tranzova challenged Miles' credibility below. And the board, acting within its purview, says that Appendix 10, Note 3, that Miles is credible. And furthermore, with respect to the idea that the deletion happened for some other reason, or that there was some sort of nefarious reason for Miles to go forth and manufacture XY sole ownership, or that they were trying to deprive Green of inventorship in some way. Those are arguments that Tranzova does not renew on appeal. And I think for good reason, the board has an explicit finding, again, that Appendix 17 to Appendix 18, that would be pure speculation. It says that the record is devoid of any evidence of impropriety. So what you have here is Miles' testimony, Appendix 985, which specifically explains the deletion. You have the board finding it credible. And the record having no other countervailing explanation for the deletion, the board chooses to accept that version, that record-based version of the events that unfolded, rather than Tranzova's version. That is the board's right to do, and it is supported here by substantial evidence. Now, I do want to address quickly the passages of the Miles' testimony that Tranzova has pointed to. And in particular, I think it has block-quoted Appendix 988 and 989, which is about the specific knowledge of the experiment. And it also quotes in its briefs a number of passages about Appendix, for example, Appendix 911 to 914, about Green's background and his degrees, and Miles' specific knowledge of these subjects. So the first thing that I would say is that I think that these passages need to be read in their specific context. For example, at 988, the statement right before the block quote starts about whether or not Miles was present for the experiment being conducted, Miles says it doesn't require knowledge of his entire background to know what role he played in performing that specific set of experiments. The second thing is I think you need to read the evidence as a whole. Here, importantly... Counsel, go to, on 983, go to line 20 or so. They're asking him, yeah, and they're asking Mr. Miles, they're looking at his credibility, and at line 20, answers yes, but you don't, and then the question, but you don't know for a fact that Mr. Green was a bench technician, correct? And then he goes and answers that question based on the diligence that was performed. Then they said, well, how do you know about his diligence? And the following page, this answers, with my discussions with Dr. Cran, my understanding of the supervisory roles at Cogen. So isn't that a departure from his own knowledge, and now he's depending on his discussions with another person in order to evaluate the diligence performed by Mr. Green? Well, two responses, your honor. So when he says my understanding of his supervisory roles at Cogen, I believe he's referring to his other knowledge. We don't, we don't dispute that, that Miles had a conversation with Cran, but he also acquired knowledge independently through his own dealings as the attorney in charge of the licensing agreements and the relationship. That's not what he says. He says that it's based on the diligence that I performed. Do you know that he was a technician? He says, yes, I know that he was a bench technician based on the diligence that I performed. What diligence? And then he answers my discussions with Dr. Cran. Well, well, your honor, I would suggest that you read down to the end of 984 as well, where he is asked specifically. So your determination that Mr. Green was a bench technician, that you had with Dr. Cran, correct? And he answers, I don't think that's entirely correct. And I don't think I testified that it was solely based on that. I understand the structure of Cogen at the time. And I understand what Dr. Cran's position was as XY's liaison. This is the passage at appendix 985 that I had read before. And so, yes, he certainly makes that statement at the top of 984. But I think when read in context, he certainly clarifies that at the end of 984 going on to 985 and explains the independent basis for his knowledge, separate and apart from his conversation with Dr. Cran. Okay, good. Thank you. Michael, did I hear the timer go off? No, apologies, your honor. Something else. All right. You may proceed, Mr. Chen. If there are no further questions from the court, I'm happy to yield the ballot at my time. Okay. Any further questions from my colleagues? No. Okay. So, let's go back to Mr. Kelly. And you have five minutes to the extent you need all that time, okay? Yes, thank you, your honor. I think the court is correct to focus on the correct time here, right? The time when Miles wrote the patent application, what he knew at the time, what diligence he had performed at the time. And with respect to Liu, Table 3, and Green's role, Miles performed practically no diligence on that. He admitted that he never asked to speak to either Cran or Green. He admitted never speaking to any of the other inventors about Green. This is specifically at Appendix 891 to 892. At 891, he's asked, what specifically did Suh, about Mr. Green's role in the invention? Answer, well, Mr. Green, they did not tell me anything about Mr. Green's role. That was developed with my conversation with Dr. Cran and my own knowledge of the people at Cogent at that time. But what people is he talking about? He never explains that. He admits he's not talking about Mr. Green because he didn't know Mr. Green. He didn't even know Mr. Green's first name. He says Cran called him and said, that's David Green, an employee of Cogent. There's zero admissible evidence to support that. That comes straight from Cran. At the time Miles prepared the priority patent application, he testified again that he didn't know Green, had never met the man, had never spoken to him, did not know what his education level was, didn't know his technical background, and had no idea what experiments he performed. That's at Appendix 912 and at 988 to 989. Again, I think it is important to focus on 988 and 989 because that is the last word on this matter. This is after he said, well, I have a general knowledge of Cogent and its structures. I specifically pinned him down. I said, what about Green? And what about Lew Table 3? What is the source of your knowledge about that? And I said, were you there when he performed the experiments? No. So you have no personal knowledge of what experiments he performed. That's correct. Your knowledge comes from a conversation you had with Cran, correct? That's correct. And that knowledge comes from a single conversation that you had with Dr. Cran, correct? Again, with respect to Table 3 experiment, that would be the source of my information about Mr. Green's participation. He has admitted everything he knows about Green, his status and his role in the Table 3 experiments came from Cran. That conversation occurred after Miles stripped Green's name from the Table 3 caption, after he made a determination to not name him as an inventor and the board's reliance on those actions and its attribution to Miles of having some independent knowledge when he committed those actions. Mr. Kelly, what is it that you believe that Mr. Green did that amounts to being a co-author or co-inventor of Table 3? I mean, do you have a specific conception in mind of what it is that Green actually did? Yeah, I think it was a not insignificant contribution. Can you paint the actual picture? I don't know what insignificant contribution means. Sure. I think what's undisputed, because even according to Miles, Cran told him, Green's the one that performed the experiments. Think about what those experiments are. The conception is the reduction of practice in these experiments. He's the one that stains the sperm, that separated the sperm, that fertilized the eggs, that compared the fertilization results to control and then recorded the data. What did Cran do? Cran said that he conceived it. He conceived of what? All the steps were performed by Green. There's no conception really required here. Green performed the steps. He compared the data. Anyone can do the math and say, well, that's 70%. That's the entirety of the invention. That's the claimed novelty of the invention. Simply looking at the results and saying it's 70% of control. Well, Green did that. He did that when he put that data together. You're making it sound like Green invented the entire claim. He's the sole inventor of the patent. Well, I'm not saying that and I certainly don't have to prove that. All I have to prove is what we know he did, which is performed all the steps of the experiment because Cran allegedly told Miles that. That's sufficient to, at a minimum, make a determination that he made an inventive contribution. Mr. Kelly, he may have performed the steps, but did he conceive the steps? Again, the steps here are simply fertilizing eggs with sorted semen and then comparing those results. I don't think there's much conception there. I would say there's very little light between conceiving of fertilizing an egg and performing the step of fertilizing an egg. Is there anything in the record that Mr. Green was investigating stain concentration? I thought Miles testified that Dr. Cran was the one doing concentration research. Well, no, I don't know that Miles testified to that at all. I think the evidence in the record is that the sole experiment directed to testing stain concentration is Table 3. Cran attributed the data from that table to Green and thanked Green for his permission to use that data. Again, why would Cran thank Green for his permission to use the data if it was Cran's invention, if it was Cran's experiments from the outset? I think we're out of time now. Do you want to give a concluding sentence or so, Mr. Kelly? Sure. I would say the overwhelming weight of the evidence here establishes that Green made an inventive contribution to Loo Table 3. The board's decision to the contrary was rife with errors, which are pointed out in our brief and should be reversed for the reasons stated therein. Okay. Thank you. We thank the parties for their arguments. This case is now taken under submission.